| 13 | 169 |
| 30 | 319 |

[No. 1365.]

## FRED. E. WAITE *v.* THE STATE.

1. MURDER—EVIDENCE—EXPERT TESTIMONY.—Whether or not the instrument in evidence, identified as that with which the homicide was committed, would, in the hands of a man of ordinary strength, and used as a bludgeon, produce the wounds described and be likely to produce death, was a question to expert witnesses properly allowed, and their answers were properly admitted.

2. SAME.—The opinions of medical men, who are shown to be experts, as to the instrument producing, and the nature and consequences of wounds, or the causes of diseases, are competent evidence in a prosecution for homicide. Likewise, the rule has been stated that the testimony of a surgeon is admissible to prove the nature of a wound, and its probable cause and effect.

3. SAME—EVIDENCE.—The flight of the defendant after the commission of the offense, and the attendant circumstances, are legitimate matters to be considered in connection with other evidences of guilt.

4. SAME—CONFESSIONS.—A voluntary statement of the facts concerning the homicide, prepared and reduced to writing by the defendant after his arrest, and by him delivered to the witness, after being duly warned that it would be used against him, was competent and admissible as evidence in behalf of the prosecution.

5. SAME—PRACTICE IN THIS COURT.—The action of the court below in admitting illegal evidence will be revised by this court only when it appears that the defendant interposed objection when it was offered on the trial.

6. SAME—CHARGE OF THE COURT.—No issue was raised at the trial of this case as regards the consequences and effects of the confession in evidence. No special instruction was asked with regard to its consideration by the jury; and no exception was saved to the charge as given because of the omission to announce the law governing the question. *Held,* that to authorize this court to revise the charge in this case, it was incumbent on the defendant, if he desired it, to ask a more explicit or special charge on the question involved.

7. EVIDENCE.—See evidence *held* sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Robertson. Tried below before the Hon. W. E. Collard.

The indictment in this case charged the appellant and two others, Wyatt Banks and Daniel Compton, with the murder of

Ad. Wyser, in Robertson county, Texas, on the twenty-eighth day of May, 1882. Upon a severance, the State elected to try the appellant first. He was convicted of murder in the first degree, and was awarded the death penalty.

A. C. Tilley was the first witness introduced on behalf of the State. He testified that on the twenty-eighth day of May, 1882, he resided in the town of Franklin, Robertson county, Texas. On that morning, between eight and nine o'clock, the witness was standing on the streets of Franklin, about one hundred yards from the jail, and in full view of the front of the jail. He noticed at that time an unusual disturbance or commotion about the jail. The witness's first impression was that a race with the dog was projected, and he started to the jail, but he had not gone far in that direction when he saw "Uncle Johnny," the jail cook, knocked out of the door, and some persons run out of the front door and pass rapidly around the west end of the jail building towards the brush. The witness positively and emphatically identified the defendant as one of the parties who then ran out of the jail into the brush.

The witness then ran rapidly to the jail and into it through the doors, which were all open. When the witness got inside of the jail building, he found Ad Wyser, who was jailer at that time, lying, or more properly half sitting, on the floor at a point near the center of the corridor, his head towards the back of the corridor and his feet extending towards the door. A negro named Jordan Scott was supporting his head and back. The negro had an empty tin cup, and from the fact that Wyser's head was wet the witness inferred that the negro had been pouring water on the wounded man's head. The witness went to the deceased, took him by the hands and said: "My God! Ad., what's the matter?" The deceased raised his eyes towards the witness with a look of recognition, but did not speak, and his head immediately fell forward like a drunken man's. The deceased's head was horribly beaten, and the witness saw that his head and shoulders were saturated with blood. The witness did not examine the wounds.

The witness found and examined the piece of iron piping, which was here handed him and identified. He found it lying within two or three feet of where Wyser lay. It was two or two and a half feet long, and three-quarters of an inch in diameter. The cell doors of the jail were all open at the time, and were also unoccupied. There was no one in the jail except Wyser and

the negro Jordan. Doctor Carrington came a few minutes after the witness arrived. The witness did not know that the defendant was confined in jail, and had not, that he remembered, ever seen him until he saw him run out of the jail on that morning. Ad. Wyser, with whom the witness was well acquainted, died on the night of the same day, Sunday, the twenty-eighth of May, 1882.

Doctor S. E. Carrington testified, for the State, that on Sunday, the twenty-eighth day of May, 1882, he was living in Franklin, Robertson county, Texas. He was a physician and surgeon, practicing under a diploma from a regular medical college, and was employed at the time as the regular physician to the Robertson county jail. On Sunday morning, May 28, 1882, the witness was informed by his clerk at his drug store in Franklin that the prisoners at the jail were escaping or had escaped, and he immediately went to the jail. When he got there he found the jail doors all open. He ran into the corridor and found Ad. Wyser sitting in the floor, with the negro Jordan supporting his back. Mr. A. C. Tilley was also with him, holding his hands. Wyser was bloody all over. The witness spoke to him, but he gave no sign of consciousness. The witness then had him removed to the lower front or east room of the jail.

Upon examination, after the removal of Wyser, the witness discovered five severe wounds on the back part of the head. Three of them were cut laterally across the back part of the head, and a little to the right side. The first of the three wounds was near and a little to the right of the crown; the second was a little below the first, and the third a little below the second. There was a fourth wound on the right of the back part of the head, running diagonally from the right base to the crown of the head; and on the left side of the back part of the head was a fifth wound, running diagonally from the left base to the crown of the head. The wounds varied in length from one to two inches, and in four of them the tissue was entirely destroyed to the bone. The one on the left side was not cut to the bone. These wounds were all made with a blunt instrument. The piece of iron piping identified by Tilley as the instrument which he found in the corridor of the jail was here handed to the witness, and in reply to the question, he stated that he thought such an instrument, in the hands of a man of ordinary strength, used as a bludgeon, would produce the wounds he had described, and be likely to cause death.

The deceased lived about twelve hours after he was wounded, or from about nine o'clock in the morning, when the wounds were inflicted, until about nine o'clock that night, when he died. The wounds described by the witness caused the death of Ad. Wyser. The deceased did not speak after the witness found him, but remained unconscious until he died.

Doctor G. M. D. Patterson, a physician and surgeon, practicing under a diploma from a regular medical college, testified, for the State, and in substance, to the same effect as the last witness. His description of the various wounds was a corroboration of the description given by Doctor Carrington, except with respect to the last or fifth wound, which, in his opinion, was of minor importance, and not inflicted with the same instrument with which the other four were inflicted. He discovered no fracture of the skull. The blows which produced the wounds caused concussion of the brain, from which Wyser never recovered, and were the cause of his death. A blow on the head with a bludgeon can cause death without fracturing the skull. The iron piping exhibited, in the hands of a man of ordinary strength, if used as a bludgeon, could produce the wounds described, and would be likely to cause death. This and the like statement of Doctor Carrington, was objected to, and is the subject of the first ruling in this case.

The testimony of Doctor Britt, a regular graduate, was a thorough corroboration of the testimony of Doctor Patterson.

Sam Webb, a prisoner confined in the jail on a charge of cattle theft at the time of the assault on Wyser, testifying for the State, gave a long and connected account of the enterprise which culminated in the homicide. There were five others beside himself confined in jail on the twenty-eighth day of May, 1882. They were this defendant, Dan Compton, Wyatt Banks, Jordan Scott and Austin Brown. They occupied numbers one and two of the three cells on the lower tier. The cell nearest the corridor door was number one, the next number two, and that at the further end of the corridor, number three. Banks, Scott and Brown occupied number one, and the witness, the defendant and Compton number two. Number three was unoccupied, and was always left open. It was the custom of Mr. Wyser, the deceased, who was the jailor, to feed the prisoners twice a day. The first thing in the morning he would bring water. He would come to the corridor door, and throw off the brakes, by which means the cell doors were unlocked. The prisoners would then

push open their doors and go to the corridor door with their buckets, and Wyser would fill them with water by means of a funnel through the bars of the corridor. The prisoners would then return to their cells, close the doors and Wyser would throw on the brakes, thus locking the cell doors. While the prisoners were washing, Wyser would bring their breakfast and set it down on the corridor floor in front of the cells, if the floor was clean; if not, on a stand which stood in the extreme corner of the corridor. He would then retire from the corridor, lock it, and throw off the brakes, unlocking the cell doors, and the prisoners would come out to breakfast. When they had finished, Wyser would send them back into their cells and throw on the brakes, locking them in. He would then open the corridor door and remove the food vessels, again lock the corridor door, throw off the brakes, and allow the prisoners to come out of their cells and exercise in the corridor, with their cell doors open until dinner, which was generally served between one and two o'clock. By the same process dinner was served, after which they were returned to their cells for the night.

On Saturday, the day before the homicide, and during "exercise," the witness was in cell number three, washing his clothes, at which time the defendant, Compton and Banks were in cell number two, talking together, all sitting together on a blanket. In a short time they called the witness into that cell, and told him that they were fixing up a plan to escape from the jail. The witness sat down with them, and asked them to disclose their plan to him. They informed the witness that the defendant was going to secrete himself in cell number three, which was never locked, and when Wyser came in to bring feed, would knock him down, throw off the breaks, and release the whole party. Some one of the party asked: "What are you going to hit him with, Waite?" The defendant replied: "Hell! I can knock him down with my fist." Banks then said: "Hell! no! that won't do; you'll make a failure. Get a club, or piece of iron, or something that you can knock him down with." Compton said: "Yes, get a club or piece of iron; you must not make a failure." Some one then remarked: "You will kill him;" and Banks said, "I don't care if you do kill him; he called me a d——n yaller son of a b——h, and I haven't got over it yet, and I never will get over it." Compton said: "I don't care if you do kill him, so I get out of here."

It was agreed that, when Wyser came to feed at dinner, the

defendant was to be hid in cell number three, and, if anybody came with Wyser, Compton was to say "yes," as a signal to the defendant that Wyser had company. If Wyser came alone, Compton was to say "no," as a signal that he was alone, whereupon the defendant was to slip out of cell number three, knock Wyser down, take his watch and pistol, throw off the breaks, and release the other prisoners, who were to follow him out, and divide, going to different points. To this plan the witness declared that he was no party, he took no part in its concoction, nor did he take any part in its execution, though he told the conspirators that he would go out if the doors were opened by them. While this conversation was going on in cell number two, Austin Brown was walking up and down the corridor, or "bull-ring," as it was called. The scheme was matured on Saturday, between nine and two o'clock.

Pursuant to this plan, the defendant secreted himself in cell number three, and when Wyser came to the corridor door Banks stepped out of the door of cell number two, and said "O! Waite, you can't play cards worth a d——n." There being three men with Wyser at this visit, Compton said "yes," warning the defendant that Wyser had company. Wyser then said "Pull in, boys" (his order to go into the cells), and the prisoners, with the exception of the defendant, who was secreted in cell number three, which was never locked, retired to their cells, and Wyser threw on the breaks, locking them in. After Wyser had locked the doors and retired, the defendant came out of cell number three, and, walking up and down the corridor, said: "Boys, don't you wish you were all like me?" Banks replied that he did not, unless he could get clear out. The defendant replied: "Never mind, we'll all be out of here in the morning."

Respecting the signal to be given, the original plan was here altered. If, when Wyser came with breakfast on the morrow, any one should come with him, Banks was to whistle. If he came alone, all the party were to remain silent. The defendant directed Compton and Banks to put dirt and trash in front of the cells, so that Wyser would take the food to the stand in the corner near cell number three, and thereby give the defendant a better chance of striking him from the door of cell number three. The defendant, after this was arranged, went back into cell number three, but came back presently with his feet wrapped in fragments of a blanket, to show how noiselessly he could walk. He had in his hands at this time the piece of iron piping

which was now in evidence. He exhibited the weapon, and said: "I think this is sufficient to knock him down." Banks and Compton said: "Yes, that will fetch him." At the defendant's request, the witness then passed him a blanket through the cat hole of the cell. The defendant got up early next morning, and said to the others: "Boys, you must not forget your parts;" and Banks and Compton both replied, "We won't."

The next morning, Sunday, the water was served in the usual method. When Wyser threw on the brakes to lock the cell doors preparatory to serving breakfast, Banks, Scott and Brown were in cell number one, the witness and Compton in cell number two, and the defendant was secreted in cell number three, the door to which, opening to the corridor, was open. When Wyser came with the breakfast he was alone, and Banks did not whistle, which signalled that fact to the defendant. Wyser opened the corridor door, and passed with the breakfast and placed it on the stand in the extreme corner of the corridor, and then turned to go out. When he had reached a point on his return between cells number one and two, the defendant slipped up behind him and struck him on the head with the peice of iron. The first blow brought Wyser to his knees, when the defendant caught him by the collar, jerked him backwards, and struck him three or four blows over the head with the iron. Wyser fell over on his back, and lay still, and the defendant took his watch and pistol. At this juncture Brown or Scott said: "Don't you kill that man," and the defendant pointed the pistol at them and said: "Hush or I'll kill you." The defendant then started out, and Banks said: "Don't forget the brakes, Waite!" and Compton said: "For God's sake throw off the brakes." The defendant threw off the brakes and the party went out, the defendant first, Banks next, Compton next, the witness next, and Brown next, and struck for the brush. The witness and Compton were captured together, a short distance from the jail. The assault and escape occurred about nine o'clock on Sunday morning, May 28, 1882.

The witness reiterated on his cross-examination that he was not a party to this agreement, that he had no part in its conception or execution, and that he merely agreed to leave the jail if the defendant, Compton and Banks should succeed in opening the doors. He occupied a position in his cell at the time of the assault from which he could plainly see all that occurred, and he saw it all occur just as he related it. The witness was a negro.

Austin Brown, another negro, who, according to his testimony, was confined in jail, at the time of the assault, for the non-payment of a fine of twenty-eight dollars and costs, assessed against him for card playing, corroborated the witness Webb, in every particular, even to details. He, too, according to his statement, was innocent of any participation in the origin or execution of the plan of escape. He was not even consulted, nor did he learn of the proposed attempt to break jail until informed by Banks in reply to his inquiries as to what was the purpose of the frequent and suppressed conferences between the defendant, Banks and Compton.

D. S. Guinea, a deputy sheriff of Robertson county, testified, for the State, that he, in company with T. J. Simmons and J. K. Ross, was at the corridor of the Robertson county jail, in Franklin, on the morning of May 30, 1882, and he heard a conversation between the defendant and J. K. Ross at the corridor bars. The defendant told Ross that he was willing to make a written statement concerning the escape from jail and the assault upon Wyser. He was duly cautioned that if he made such written statement it would be used as evidence against him. He said that he did not care, that he would make it as a voluntary statement if it hung him. The witness then brought pen, ink and paper, and gave it to the defendant, who thereupon sat down upon a box in the corridor, and in the presence of the witnesses named wrote and signed his statement. Before he read it over, the defendant was again warned that it would be used in evidence against him. He said that he was perfectly willing that it should be. He then read it over, and delivered it to J. K. Ross, as his voluntary statement, in the presence of the witness. The witness recognized the document exhibited to him as that written and signed by the defendant on that occasion. It is the instrument or confession involved in the ruling of this court, and was read to the jury. It is as follows:

"Franklin, May 30.

" The statement of the death of Ad. Wyser, voluntarily made:

" The first attempt was to be made on Saturday at dinner time. The plan was laid between nine o'clock a. m. and two o'clock p. m. of Saturday, the twenty-eighth of May. The plan was as follows: In the morning Mr. Wyser came in alone to issue the rations for breakfast. He was asked by some one of the prisoners, I don't know which one, where Dan was (Dan was the col-

ored man employed around the jail), and Mr. Wyser said that he had gone away on business. He went out and left us in the corridor for exercise. It was after he had gone out that we commenced laying plans. It was talked over first between myself, Mr. Compton and Sam Webb, and then W. Banks and J. Scott were taken in, and they all agreed to take the following parts: I was to go into cell number three (the door of which was left open all the time) as soon as we heard the keys jingle for dinner. Then Mr. Compton was to watch and see if there was anybody on the outside of the jail, who could help Mr. Wyser, while I was overpowering him. If there was anybody there, he was to say "yes," if not, "no." W. Banks and J. Scott were to tell Mr. Wyser to set the pan of rations back on the washstand (he, Mr. Wyser, being in the habit of leaving it near the door when he came in with it), so I could have him farther from the outside door, at the time of the attack. If I knocked him senseless I was to throw off the brakes, and let the other prisoners out. I was to have his watch and pistol. When dinner came, Mr. Compton gave the signal not to strike, so I came out of cell number three and saw three men on the outside of the corridor. I then went back in cell number three, when Wyser shut the doors for the night. After he was gone I came out in the corridor, and Sam Webb gave me my blankets to sleep on out of my own cell. About five o'clock p. m. I went to cell number one, which contained W. Banks, J. Scott and A. Brown. I told them I would try to get out the next morning. It being Sunday morning we all thought it would be a good time, because there was nobody around town then. The parts were to be as follows: Jordan Scott was to tell Mr. Wyser to set the pan on the washstand at the back of the corridor. W. Banks was to give the signal whether to strike or not. The signal was to be, if there was anybody outside of the corridor he was to whistle, if not to keep still. All the prisoners were to make all the dirt possible in front of their cells, so as to have an excuse to have the pan set on the washstand. I brought the piece of iron I was to strike with outside and showed it to the boys. It came from the upper row of cells, and was broken from the water fixtures in trying to get the plug out to empty dirty water. It was placed near the corridor so it could be reached from the lower row of cells. I do not know how it came down, as I did not see it until I was trying to find something to strike with. I found it then in the empty cell. Sunday morning came, and I got up early, and

went out into the corridor and told the boys to remember their parts, and that if there was a chance I would carry out the programme. Mr. Wyser came in about half-past eight o'clock a. m. and there was no whistle, so I got ready to strike. He came in and walked to the back end of the corridor, and when he turned around and had gone about three feet, I struck him on the top of the head. He turned around and reached for his pistol, and I struck him again. He said something which I could not understand, but as near as I could make it out it sounded like "stop there," and he threw back his hands and looked around, and I struck him again. He fell against the corridor, then on his back to the floor. I stooped and got his watch and pistol and started out, when two or three of the boys said: "Throw off the brakes." I turned, threw off the brakes, and ran for the woods. I did not look behind until I was in the woods, when I looked around and saw Sam Webb and D. Compton. The boys were to go to the following places: I was to go either to St. Louis or Chicago. Compton was to go home until the day of his trial, or he could give bond. Jordan Scott was to go somewhere, about eighteen miles off, until he could hear from his case. I do not remember where Sam Webb was to go. W. Banks was to go to Bremond. Brown did not tell where he was to go. If any of the boys were caught, they were to lay the whole business on me, because I did not live here, and did not expect to get caught.

"FRED. E. WAITE."

Lucien Wilder, who lived near Owensville, some three or four miles from Franklin, testified that on Sunday, the twenty-eighth day of May, 1882, he was in Calvert, and heard, during that day, of the escape of the prisoners and the assault upon Wyser. When he reached his home, about sundown on that evening, one of his tenants told him that a white man had been to his house, asking for something to eat. From the description given by his tenant, the witness was satisfied that he was the man who assaulted Wyser. The witness immediately got his gun and horse, and, with Jim Cox and Dave Hodge, started in pursuit. The pursuing party overtook defendant a little after dusk, in a lane on the edge of Beck prairie, about eight miles from Franklin. Within thirty steps from him, the witness ordered him to halt, to which order he paid no attention. The witness repeated the order, telling him to throw up his hands. He threw up his left hand, and with his right drew a pistol and commenced

firing on the party, his first shot killing the witness's horse. He fired five or six shots as rapidly as the trigger could be pulled. When he had emptied the pistol, he started to run. The witness's horse fell, and the witness started after the defendant, and, as he was about to jump a fence into a cornfield, the witness pulled down both barrels of his gun, but both snapped. The witness followed no farther, but sent Hodge back to Franklin for assistance and the dogs. He then aroused all the neighbors and surrounded the cornfield.

The party from Franklin arrived with the dogs after a short while, and the dogs were put on the trail where the defendant jumped the fence, and within ten or fifteen minutes he was captured in a strip of woods in the field, about a quarter of a mile from where he scaled the fence. The witness recognized the defendant as the man who shot at him as described, and whom they caught with the dogs on the evening of the killing.

The witness James Cox testified, for the State, to the same effect as the witness Wilder. The testimony of these two witnesses was objected to as irrelevant, and is one of the subjects of the rulings of this court.

Deputy sheriff R. G. Scott, who was one of the pursuing party, and who was present at the capture of the defendant, testified, for the State, that he asked the defendant, after he was secured, what he had done with Wyser's pistol and watch. He denied having them at first, but finally pointed out a place where he had buried them under some trash. They were exhumed, and identified as the property of the deceased.

The motion for new trial assailed the charge of the court, the organization of the jury, alleging that it included a juror who was disqualified by reason of not being a legal voter, and impeached the evidence as insufficient to support the verdict, because it did not show a design to kill the deceased, or, that the blows were struck with a deadly intent. The motion was overruled.

No brief for the appellant has reached the reporters.

*H. Chilton,* Assistant Attorney General, for the State.

WHITE, P. J. Appellant Waite and two other parties, Wyatt Banks and Daniel Compton, were charged by indictment with the murder of one Ad Wyser, by striking him with a piece of iron piping, on the twenty-eighth of May, 1882. Defendants

prayed a severance, and, the same being granted, appellant Waite was put upon his trial. It resulted in a conviction of murder in the first degree with the death penalty; and from that judgment this appeal is taken.

A piece of iron piping, described by the witnesses as being about two or two and a half feet long and three-quarters of an inch in diameter, was the instrument with which it was proven the blows were inflicted that caused the death. The medical experts, Doctors Carrington and Patterson, who had been called to see the wounded man, and who had examined his wounds before and after death, after having testified to the nature and character of the wounds, were shown the piece of iron piping, which was in court and which had been identified by another witness as the instrument used in the killing, and were asked by the prosecution the question, "Would such an instrument in the hands of a man of ordinary strength, used as a bludgeon, produce the wounds you have described and be likely to cause death?" which question the court permitted the witnesses to answer, over the objection urged by defendant "that the witness could not give his opinion as an expert upon the point to which the question was directed." This supposed error is made the first ground in motion for a new trial.

The witnesses were introduced as experts, and the question was proper and their answers admissible. "The opinions of medical men who are shown to be experts as to the instruments producing, and the nature and consequences of wounds, or the causes of diseases, are competent evidence in a prosecution for homicide." (*State* v. *Murphy*, 33 Iowa, 270; *State* v. *Porter*, 34 Iowa, 131; 1 Green's Crim. Law Rep., 241; *Page* v. *The State*, 61 Ala., 16; *Rash* v. *The State*, 61 Ala., 90.)

Mr. Wharton, in his work on criminal evidence, cites numerous authorities in support of the doctrine that "a surgeon is admissible to prove the nature of a wound and *its* probable cause and effect." (Whart. Crim. Evid., sec. 412. See also *Ebos* v. *The State*, 34 Ark., 520; and *Shelton* v. *The State*, 34 Texas, 662.)

It was also objected that the court erred in admitting the testimony of the witnesses Wilder and Cox as to the circumstances connected with the flight and the recapture of defendant after his escape from jail. In this the court did not err. Flight and the attendant circumstances are legitimate matters to be considered in connection with other evidences of guilt. (Clark's Crim. Law of Texas, p. 544.)

After his rearrest and confinement in jail defendant wrote out a voluntary statement of the facts concerning the killing, after he had been duly warned that it would be used against him on his trial. This statement was produced in court, identified, and read in evidence without objection from defendant. Had the evidence been illegal, defendant could not be heard to complain of its introduction, if he interposed no objection at the time. On the other hand, the statement was not only a voluntary confession, freely made, without compulsion or persuasion, but it was written out, signed, and delivered by defendant to the witness after he had been previously warned and fully apprised of the fact that it would be used as evidence against him. Such being the case it was admissible, and should have been admitted, even though objection had been made at the time it was offered in evidence. (Code Crim. Proc., Art. 750.)

Nor was any issue raised at the trial with regard to the consequences and effect of this confession. The facts stated, independent of the confession, were fully established by other testimony. No special instruction was requested with regard to its consideration by the jury, and no exception was saved to the charge as given, because of omission to announce the law applicable to it. As given, we see no objection to the charge, and if a more explicit or special enunciation of the law with regard to this particular subject was desired, defendant should have requested it by special instruction, and then its necessity would be inquired into by us. We find the charge a full and clear declaration of the principles of the law upon all the issuable facts in the case, and we do not think the court erred in declining or omitting to charge upon it.

It only remains for us to pass upon the facts. As to their sufficiency, there is and can be no question of defendant's guilt. He has voluntarily confessed it to the fullest extent. Had he not done so, the other testimony fully establishes, beyond reasonable doubt, that he willfully, deliberately and with express malice took the life of Wyser, and also robbed him of pistol and watch. The fact that he was a prisoner and committed the deed to effect his escape from custody affords no excuse, justification, or even extenuation of his crime. We see no error in the judgment and it is in all things affirmed.

*Affirmed.*

Opinion delivered November 11, 1882.